**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____x

Jennifer Ryan,

                Plaintiff,               Case No.  5:26-cv-863 (GTS/CBF)

    v.

                                     JURY TRIAL DEMANDED

New York State Office For People with
Developmental Disabilities, Central New York
Developmental Disabilities Services Offices,
John Lenhart and Deanna Jenkins individually,

                Defendants.

_____x

       Plaintiff Jennifer Ryan, by and through her attorney the Nisar Law Group, P.C. complaining of Defendants New York State Office For People with Developmental Disabilities, Central New York Developmental Disabilities Services Office, John Lenhart and Deanna Jenkins individually alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.     This is an action under 42 USC §1983 by Plaintiff Jennifer Ryan ("Plaintiff") a former employee of single integrated employer, New York State Office For People with Developmental Disabilities ("OPWDD") and its sub-agency or affiliate Central New York Developmental Disabilities Services Office ("CNYDDSO"), together with Deanna Jenkins, Plaintiff's direct supervisor and John Lenhart, supervisor to both Jenkins and Plaintiff at CNYDDSO/OPWDD, who all deprived Plaintiff of her rights to free speech and assembly protected under the First Amendment to the United States Constitution ("U.S. Const.") and applicable to the state of New York by the Fourteenth Amendment to the U.S. Const.; and retaliated against Plaintiff with

1

discharge from employment on or about February 19, 2025 for exercising her constitutional rights; and (b) for denied and interfered with Plaintiff's requests to take medical leave and discharged Plaintiff in retaliation for Plaintiff's attempts to exercise her rights to take medical leave in violation of the Family Medical Leave Act, 29 U.S.C. § 2611 et seq.; and (c) retaliatory discharge of Plaintiff in violation of New York Labor Law ("NYLL") section §741 for opposing and refusing to participate in Defendant employers' unlawful policies and practices of mandatory overtime in violation of NYLL §167 that required her to work consecutive shifts in excess of 24 hours and for failing to adequately provide medical supplies for patients that posed a danger to public health.  As a result, Plaintiff seeks redress and damages including but not limited to: back pay, front pay in lieu of reinstatement, lost wages, emotional distress damages, liquidated damages, punitive damages, attorney's fees, costs and interest in amounts to be determined at the time of trial and any and other further relief that this Court deems just and proper.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, 42 USC §1983, the First Amendment to the U.S. Constitution and the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 et seq.

3.      The Court has supplemental jurisdiction over Plaintiff's NYLL §741 claims that are related to or inextricably intertwined with the federal claims pursuant to 28 U.S.C. § 1367.

4.      Plaintiff was at all relevant times, an employee within the meaning of the applicable federal and state statutes.

5.      Plaintiff was at all relevant times a qualified employee within the meaning of the applicable anti-discrimination statutes.

2

6.      This Court has jurisdiction over the Defendants who are state actors within the meaning of 42 USC §1983; and employers within the meaning of NYLL §741(b) which states in relevant part, "(b) "Employer" means …the state, or any political subdivision of the state which (i) provides health care services in a facility licensed pursuant to article twenty-eight or thirty-six of the public health law; …(iii) operates and provides health care services under the mental hygiene law or the correction law…"  Moreover, the Court of Claims does not exercise jurisdiction over agents of the state or individual state officials and the New York State Supreme Courts have concurrent jurisdiction over NYLL §741 claims against the State.

7.      This Court has personal jurisdiction over the Defendants, pursuant to New York Civil Practice Law and Rules § 301 as Defendants reside and/or transact business within this State, employed Plaintiff within the State of New York, and otherwise engaged in conduct that allows for the exercise of jurisdiction as permitted by the Constitution of the United States and the laws of the State of New York, and accordingly may be served with process pursuant to Rule 4(h)(1), Fed.R.Civ.P.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as it is a judicial district in which a substantial part of the events or omissions giving rise to the claims have occurred

## STATEMENT OF FACTS

### THE PARTIES

5.      At all relevant times, Plaintiff Jennifer Ryan ("Plaintiff' or "Ryan") was a resident of Auburn, New York.

6.      Plaintiff was employed as a licensed practical nurse ("LPN") with Defendants CNYDDSO/OPWDD from on or about March 2023 to on or about February 19, 2025.

3

7.      To date, Plaintiff has approximately 28 years of experience in the healthcare industry. Plaintiff has approximately 21 years of experience as a LPN since 2005, and approximately 7 years of experience as a certified nursing assistant ("CNA") experience from on or about 1998 to 2005.

8.      Plaintiff's contract work assignments for Defendants were made through a placement agency named AYA Healthcare Services, Inc., an employment placement agency through a recruiter named Ashleigh Aqauzzino ("Aqauzzino"), that was scheduled to end on or about July 5, 2025.

9.      Based on an assignment offer letter dated on or about June 10 2024, Plaintiff was assigned to work at the Defendant CENTRAL NEW YORK DEVELOPMENTAL DISABILITIES SERVICES OFFICES ("CNYDDSO") located at 187 Northern Concourse, North Syracuse, NY 13212. However, Plaintiff regularly worked at CNYDDSO group home worksite located at 94 West Genesee Street, Skaneateles, NY during the relevant time period of her employment.

10.     Plaintiff did not at any relevant time perform work for or at the offices of or location of AYA Healthcare Services, Inc. ("AYA"), that is based upon information and belief, a Delaware corporation registered with the New York State Department of State to do business in New York with a principal office located at 5930 Cornerstone Court West, Suite 300 San Diego, CA 92121.

11.     Based upon information and belief, Defendant NEW YORK STATE OFFICE FOR PEOPLE WITH DEVELOPMENTAL DISABILITIES ("OPWDD") with an office located at 200 West Dominick Street, Rome NY 13440 is an agency of the State of New York responsible for operating facilities that provide services to individuals with developmental disabilities.

12.     According to the website for Central New York DDSO, the viewer is directed to the website address:  https://opwdd.ny.gov/location/central-new-york-ddso-east-syracuse, the about us tab leads to the leadership page for CNYDDSO is the same as for OPWDD. For instance, Willow

4

Baer is listed as the Commissioner and Jennifer M. O'Sullivan is listed as the director of communications and senior advisor to the commissioner and liaison to the Governor' office on "internal and external communications, marketing, digital and social media, press inquiries,.." Thus, the entities have the same employees, officers and management.

13.     Based upon information and belief, email extensions for staff members of CNYDDSO had OPWDD extensions or email addresses indicative of a single entity or enterprise.  For example, Erika Young, Sr. LPN2 who worked in "Staffing Services" for CNYDDSO as indicated in her email name and address stamp, had an email address of Erika.M.Young@opwdd.ny.gov and a physical address of 200 W. Dominick St., Rome NY 13440 for "NYS Office of people with Developmental Disabilities CNYDDSO."

14.     Based upon information and belief, CNYDDSO is a sub-agency of and/or affiliated with OPWDD and thus comprise a single integrated employer of Plaintiff within the meaning of applicable statutes.

15.     AYA was the employment placement agency that assigned Plaintiff to work at CNYDDSO from on or about March 2023 to February 2025.  On or about February 19, 2025, Aqauzzino contacted Plaintiff and communicated to Plaintiff that she was discharged by Defendants CNYDDSO/OPWDD  because of Plaintiff's Tik Tok videos in violation of the relevant statutes as set forth throughout this Complaint.

16.     At all relevant times, Defendant Deanna Jenkins ("Jenkins") was Plaintiff's regular and immediate shift supervisor who controlled Plaintiff's work schedule, directed Plaintiff's work duties and had the authority to recommend discipline and/or discharge of Plaintiff.

17.     At all relevant times, Defendant John Lenhart ("Lenhart") was the Treatment Team Leader and had supervisory authority and control over both Plaintiff and Defendant Jenkins who had the

authority to discipline and/or discharge Plaintiff and to implement employment policies and practices including prohibiting the modes, means and contents of speech concerning Plaintiff's employer CNYDDSO/OPWDD.

18.     Defendant Lenhart was at all relevant times in a position of authority to stop the discrimination against Plaintiff for opposing CNYDDSO/OPWDD unlawful practices concerning unreasonable hours of work and speaking out in public forums about those employment practices or complaining internally to management about policies and practices concerning supplies and patient treatment that was a danger to public health and safety.  However, Defendant Lenhart instead participated in the discrimination and retaliation against Plaintiff as alleged throughout this Complaint.

19.     Based upon information and belief, Defendants Lenhart, Jenkins and Ashley Stock, another supervisor LPM regularly created and implemented work policies, practices and procedures for CNYDDSO, through "Courses" or instructional classes and listed in a form and/or format that listed the "Course Name:" and "Course Description."  The "Course" that was created by these individual Defendants in response to Plaintiff's "tik tok leaving a bad taste" were set forth as follows:

"Course Name: Personal Communication Devices and Videos Date: 2/19/25  Length (hours) 30 Minutes  Course Description: All videos are prohibited.  Some have been submitted as a HIPAA violation and the state may take recourse.  Any further videos noted will be a formal counseling and then an NOD.  Several violations may result in significant fines or termination…Location: Skaneateles IRA… Delievery Method: …Read and Sign X"

20.     Based upon information and belief, the management of employer OPWDD/CNYDDSO including individual Defendants Lenhart and Jenkins discharged Plaintiff on or about February 19,

2025 because Plaintiff previously posted several tik tok videos during on or about February 2025 which management described as having "left a bad taste" when they discharged Plaintiff.  These tik tok videos factually and truthfully depicted Plaintiff's the terms and work conditions of Plaintiff as detailed *infra* at CNYDDSO and the risks to public health and safety that they posed.

21.    Based upon information and belief, Defendants Lenhart and/or Jenkins further instituted or implemented a blanket social media workplace policy of "no videos" or be subjected to discipline up to and including termination against the employees of OPWDD/CNYDDSO on the same day that Plaintiff was discharged on or about February 19, 2025 based on the contents of her tik tok complaining of Defendants' work policies.  Defendants Lenhart and Jenkins thereby violated the First Amendment Rights of employees including Plaintiff of Defendants OPWDD and CNYDDSO.

22.    All named Defendants intentionally, maliciously and with wanton disregard for the law, chose to interfere with and/or violate these employees including Plaintiff's right to free speech under the First Amendment thereby depriving them of their constitutional rights and All named Defendants violated NYLL §741 by discharging Plaintiff and threatening to discharge any other employees to deter them *in terrorem* from complaining about or speaking out about the terms and conditions of their employment that posed a threat to the health and safety of Defendants OPWDD and CNYDDSO's employees and patients as further set forth *infra*.

23.    Prior to Plaintiff's discharge on or about February 19, 2025, Plaintiff's excellent work performance resulted in renewals of her contract assignments to work at CNYDDSO.  Plaintiff's last contract renewal occurred on or about June 10, 2024 and was scheduled for renewal on or about July 5, 2025.

24. Prior to Plaintiff's discharge, Plaintiff did not have a history of negative work performance or discipline and Plaintiff was a qualified employee within the meaning of the relevant statutes.

25. Plaintiff earned approximately $183,581.82 annually in this position with CNYDDSO/OPWDD.

26. Throughout her employment at CNYDDSO/OPWDD, Plaintiff worked under the direct supervision and control of Defendant Jenkins, a Senior Licensed Practical Nurse. Defendant Jenkins determined Plaintiff's daily work assignments, work location of CNYDDSO/OPWDD, shift schedules, patient care duties, workplace policies and had the authority to recommend or directly discipline and/or discharge Plaintiff.

27. Based upon information and belief, on or about August 2024, Defendant Jenkins referred to Plaintiff as "toxic" to Defendant Lenhart who had supervisory authority over Defendant Jenkins and Plaintiff because Plaintiff complained about lack of medical supplies and substandard treatment of patients at Defendants' facility during 2023 into 2024 as further detailed *infra*.

28. Shortly thereafter, Plaintiff addressed Defendant Jenkins' derogatory remark to Defendant Lenhart which Defendant Lenhart dismissed Plaintiff by stating that she heard things incorrectly and that he would look into the "toxic" comment. However, Defendant Lenhart failed to follow up with Plaintiff about this incident.

29. On or about February 13, 2025, supervisor Jenkins deliberately caused Plaintiff to work a consecutive 24 hour shift from February 13 to 14, 2025 in retaliation for Plaintiff's prior complaints about workplace practices that Plaintiff reasonably and in good faith belief posed a health and safety risk to herself and the patients as set forth throughout this Complaint.

**Unsafe Working Conditions That Created a Danger to Public Health and Plaintiff's Protected Complaints or Activities**

30. During her employment at CNYDDSO, Plaintiff repeatedly observed and reported unsafe

working conditions and violations of New York labor law at CNYDDSO to Aquazzino of AYA.

31.     On or about October 14-15, 2023, Plaintiff was forced to work a continuous 27.5-hour shift without a break which created a dangerous work environment for both Plaintiff and client patients of CNYDDSO.  Plaintiff reported the incident to AYA Healthcare and responded to Plaintiff that they could reduce her work schedule to remove all of her overtime hours and decrease her schedule to 40 hours per week.

32.     On multiple occasions, Plaintiff documented and complained to Aqauzzino at AYA about the chronic failure of CNYDDSO to provide basic medical supplies, including gloves, antibacterial soap, and other essential personal protective equipment.

33.     On or about August 6, 2024, Plaintiff was unable to provide ibuprofen to a patient because there were none.

34.     On or about August 7, 2024, at a staff meeting Plaintiff reported the lack of ibuprofen supplies, cleaning supplies and soap.

35.     On or about August 10, 2024 a patient was improperly transported to another room because the house director chose not follow protocol which compromised patient care.

36.     On or about August 12, 2024, Jenkins placed a dirty and old suction machine in the medical room and was heard on the phone by Plaintiff stating that Plaintiff, another nurse and patient aide were "toxic" for complaining about supplies.

37.     The supply shortages of gloves were so severe that in response to Plaintiff's complaint to Aquazzino at AYA, Aquazzino agreed to send gloves directly to the Facility because CNYDDSO failed to provide them.

38.     Plaintiff's complaints addressed matters of public health concern, including patient safety, healthcare worker safety, compliance with infection control standards, and adherence to New York

labor laws governing healthcare facilities.

### The February 2025 Mandatory Overtime in violation of NYLL §167

39.    NYLL §167 defines an employer as "any person or group of persons….which provides health care services (i) in a facility licensed or operated pursuant to article twenty-eight of the public health law, including any facility operated by the state, a political subdivision or public corporation…"

40.    NYLL §167 (2) (a) states in relevant part, "no health care employer shall require a nurse to work more than that nurse's regularly scheduled work hours…" The exceptions under NYLL 167 (3) in relevant part are: "…in the case of: a. a health care disaster…b) federal, state or county declaration of emergency…c. where a health care employer determines there is an emergency…in which case the health care provider shall, before requiring an on-duty employee to remain, make a good faith effort to have overtime covered on a voluntary basis, including, but not limited to calling per diems, agency nurses, assigning floats, or requesting additional day of work from off-duty employees, …"

41.    On or about February 13, 2025, Defendant Jenkins scheduled Plaintiff to work a shift from 2pm to 10pm however, at approximately 10:15pm after her shift, Defendant Jenkins deliberately required Plaintiff to work through 7:45am the next day February 14, 2025 when other staff were available to take that shift;  thereafter, Defendant Jenkins scheduled Plaintiff to return to work at 2pm that same day, February 14, 2025 and work until 10pm.

42.    Plaintiff was aware of another staff member who was present and available to cover the overnight shift but was not asked to work, which evidenced that no legitimate staffing emergency existed when Plaintiff was required to work her extra shift.

43.    Extremely fatigued after remaining awake for over a 24 hour period, Plaintiff refused to

return to work in less than 6 hours without adequate rest and reported this unreasonable work schedule via text to Aquazzino at AYA.  Plaintiff also reported to Aquazzino  that CNYDDSO routinely made their staff including herself work 16-24 hour shifts.   Aquazzino responded that all AYA could do was to demand that CNYDDSO take away all of Plaintiff's overtime hours and pay and reduce her schedule to forty(40) hour workweeks.  This threatened permanent reduction of hours was an adverse employment action within the meaning of the applicable statutes.

44.     This mandatory overtime imposed by Defendants without prior notice and without an emergency staffing justification was a violation of NYLL §167.

45.     Plaintiff in good faith complained about this mandatory overtime practice in her tik tok videos, and that it was a violation of NYLL 740.

46.     On or about February 19, 2025, Aquazzino of AYA contacted Plaintiff by phone at approximately 4pm stating that Defendants discharged Plaintiff  due to "Tik Tok leaving a bad taste in the employer's mouth."

### Protected Speech: The TikTok Videos

47.     In response to the unlawful mandatory overtime incident that occurred on or about February 13, 2025, and the previous pattern of dangerous labor practices she had witnessed at CNYDDSO facilities, Plaintiff created and posted several TikTok videos during on or about February 2025 to bring the matter to public awareness and communicate the need for New York labor law protections for healthcare workers regarding mandatory overtime.

48.     Plaintiff posted a tik tok video on or about February 14, 2025 captioned "The shitty part of nursing" with a comment at the bottom stating in relevant part, "And the world wonders why so many nurses are leaving the profession."  This video garnered approximately 23,200 views. Plaintiff stated in relevant part, "I just finished an 8 hour shift and I am mandated until the

11

morning…I'm not sure when I'm gonna be getting out…it's supposed to be 6am.  However I am the 6am nurse tomorrow, and so I will be waiting until they can find somebody to relieve me…I can't leave because then they could take my license…and I can get in trouble for abandonment…been up since 5:30 this morning so I'm going to be up for over 24 hours.  And what really sucks is that I am expected to do the job correctly…there's no leeway…There's nothing I can do about it right now…And hopefully I'm gonna have a license in the morning…"

49.      Plaintiff posted a tik tok video on or about February 15, 2025 captioned, "NYS Law on mandating nurses" with a comment on the bottom stating in relevant part, "The law says there is no mandating a nurse unless it's an emergency…"  Plaintiff commented in the video in relevant part, "…Limits on nurse work hours in New York.  In New York State, there is no absolute limit on how many hours a nurse can work voluntarily.  However, under New York State Labor Law… 167 there are restrictions on mandatory overtime for nurses.  So New York State Labor Law Section 167 focuses on restrictions regarding mandatory overtime for nurses.  It was enacted to protect nurses from being forced to work beyond their scheduled hours, ensuring patient safety and fair working conditions.  This includes RNs and LPNs…they are not allowed to work beyond their regularly scheduled shifts.  You can volunteer but you…cannot be mandated.  There are exceptions when mandatory overtime is allowed.  Employers can require overtime in specific situations such as a health care disaster, natural disaster or emergency, a government declared emergency, an unforeseen emergency where not other staff is available despite reasonable efforts to find replacements, ongoing medical procedures where a nurse's presence is necessary to ensure patient safety and then the employer responsibilities…the employer must make reasonable efforts to find voluntary staff replacements before requiring overtime. Employers cannot retaliate against nurses who refuse overtime beyond their scheduled hours except in allowed exceptions…This law

is designed to prevent nurse fatigue, improve patient care and protect health care workers from unfair labor practices." During the video, there was a further comment underneath that stated in relevant part, "The law says there is no mandating a nurse unless it's an emergency, natural disaster etc. Poor planning is not considered an emergency." This video garnered approximately 17,600 views.

50. The next tik tok video that was posted on or about February 16, 2025 concerned Plaintiff's extreme fatigue and having to work 2 consecutive shifts that would cause Plaintiff to remain awake for over 24 hours. This tik tok video garnered approximately 106,900 views. The video was captioned, "Nurses we really need to stick together and demand change!" Plaintiff stated in relevant part, "I'm on until 10 o'clock so hopefully…I'm not …forced nto a triple shift….if I am and nobody comes in to relieve me, there's gonna be nothing that I can do….I'm in my 21st year of nursing and I've been in healthcare for almost 30 years…its not like it was in the 90s, …the ones that are still actively working especially bedside, seems to be the worst, …we're tired, Like, we're tapping out, Like we are leaving the profession in large numbers… it's about the patient but we've gotten away from that   "

51. The next tik tok video was posted on or about February 17, 2025 with a viewer comment that stated in relevant part, "It's illegal to work more than 16 hours in one day." This video garnered approximately 3,378 views. Plaintiff commented in relevant part, "I've been researching this all day and it is actually not illegal for a nurse to work more than 16 hours in one shift. It is usually the hospital…that will put a cap on the amount of hours a nurse can work, which is usually 12 or 16 as their max. But there is absolutely no law in the United States that states a nurse cannot work more than 16 hours….here in New York,…you cannot be mandated past your regularly scheduled hours. But as we've seen in a previous video, that really isn't the case…There's nothing

to protect us.  That's how they continue to get away with this.

52.    Another tik tok video was posted on or about February 18, 2025 depicting portions of a strike by corrections officers with a comment that stated in relevant part, "Imagine if nurses stuck together like the correction officers, line man and port workers.  This video garnered approximately 35,200 views.

53.    Another tik tok video that was posted on or about February 19, 2025 prior to Plaintiff's discharge at approximately 4pm on February 19, 2025 garnered approximately 12,500 views.  This video was captioned, "Strength in numbers" with a comment below it stating in relevant part, "I wonder if Kathy Hochul has ever worked a 24hr shift.  I'm going to assume she hasn't definitely not as a nurse or in corrections!"  The content of this tik tok spoke about Corrections Officers on strike for being mandated to work unreasonably long continuous work shifts.  Plaintiff stated in relevant part, "The COs are out on strike again today in my city.  They are demanding better working conditions.  They say that they are tired of working 24 hour shifts.  And if you do follow me, you will know that this is what we've been talking about with nursing.  Many of us have worked 20+ hour shifts and it just can't continue."

54.    The videos were all truthful, factual, educational in nature, addressed matters of public concern in the area of public health, and did not specifically or generally identify CNYDDSO or OPWDD by name.

55.    The videos did not disclose any confidential information and/or personally identifiable information of patients, did not violate any patient privacy laws, and did not contain any false or defamatory statements.

56.    Plaintiff's videos constituted protected speech under the First Amendment to the United States Constitution which states in relevant part, " Congress shall make no law…abridging the

freedom of speech…or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances"   The Fourteenth Amendment to the US Constitution applies this first amendment right to the states or state actors.

57.    At the time Plaintiff posted her videos, there was simultaneously widespread public discussion by OPWDD workers about forced overtime and unsafe mandatory shift extensions. Plaintiff preserved video screen recordings of contemporaneous social media posts by OPWDD employees publicly stating they were being forced to work three to five shifts in a row.

58.    At the time Plaintiff posted her Tik Tok videos, correctional officers were also on strike, and OPWDD staff were comparing their situation to similar labor abuses affecting public sector workers throughout New York State.

59.    Plaintiff's speech addressed systemic, ongoing, and publicly debated issues affecting healthcare workers across New York State facilities.

60.    Plaintiff's Tik Tok videos also constituted a protected disclosure under New York Labor Law section §741, as it disclosed and objected to workplace practices that violated New York law and created substantial and specific dangers to public health and safety.

**Retaliatory Termination**

61.    42 USC §1983 states in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage or any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress…"

62.    The First Amendment to the U.S. Constitution prohibits the government from abridging the freedom of speech and through the Fourteenth Amendment applies the prohibition to the states.

63.     On or about February 19, 2025 at approximately 4pm, shortly after Ms. Plaintiff's video gained traction online, Ashleigh Aquazzino of AYA Healthcare, that recruited and placed Plaintiff as a LPN with Defendants called Plaintiff stating that she was discharged because the "Tik Tok left a bad taste in the employer's mouth."

64.     Based upon information and belief, on the same day Plaintiff was terminated on or about February 19, 2025, Defendants Lenhart and Jenkins issued a new OPWDD policy prohibiting all videos on its premises based on their disapproval of Plaintiff's tik tok videos that "left a bad taste."

65.     The new video policy was issued as a "Read & Sign" training dated February 19, 2025, stating: "All videos are prohibited. Some have been submitted as a HIPPA violation and the state may take recourse. Any further videos noted will be a formal counseling and then an NOD. Several violations may result in significant fines or termination."

66.     However, as alleged throughout this Complaint, Plaintiff's Tik Tok videos never identified OPWDD or CNY DDSO as her employers or their patients/clients.

67.     The reason for the Plaintiff's termination by OPWDD/CNY DDSO, which are agents of the state of New York and the timing of this new policy prohibiting all videos on its premises were clearly to restrain Plaintiff from further exercising her First Amendment rights to free / protected speech and retaliatory for opposing their unlawful policies and practices in violation of NYLL §1983.

**Disparate Treatment Demonstrating Pretext**

68.     Based upon information and belief, on or about February 19, 2025,  or around the same time as Plaintiff's Tik Tok videos, another employee at CNYDDSO recorded and published a TikTok video that actually featured patients in the background, creating a genuine HIPAA concern.

16

69.     Based upon information and belief, this comparator employee received only a written warning for conduct that posed an actual legal risk to OPWDD / CNYDDSO including violations of the Health Insurance Portability and Accountability Act ("HIPAA") that protects patient's private and confidential information including their identity and medical treatment.  Meanwhile, Plaintiff was immediately terminated for posting an educational/informational video about labor law protections for healthcare workers that identified no patients, no facility, and violated no law.

70.     This disparate treatment also evidenced the pretextual and retaliatory nature of Plaintiff's termination.

71.     A reasonable fact finder would find that these circumstances give rise to the inference of discrimination and retaliation against Plaintiff for exercising her rights to free speech under the First Amendment to the US Constitution.

**FMLA Retaliation**

72.     The Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2612 and 2615, protects eligible employees to take medical leave for up to approximately 12 weeks in a one year period for a serious health condition and prohibits employers from interfering with, restraining, or denying the exercise of those rights, and from retaliating against employees for taking such leave.

73.     During on or about December 2024, Plaintiff was hospitalized and required protected medical leave for approximately three weeks.

74.     Plaintiff notified both AYA and OPWDD that she required follow-up medical leave from on or about February 21, 2025.

75.     At the time, Plaintiff requested medical leave, she had approximately 56 hours of accrued sick time.

76.     Defendants, by and through AYA refused to allow Plaintiff to use her remaining accrued

sick time, claiming a cap had been met.

77. When Plaintiff inquired about applying for FMLA leave and expressed that she would pursue protected leave in order to receive some income during her time out on medical leave, her Aquazzino responded on behalf of Defendants in text messages that doing so would cause her contract to be terminated and would prevent her from being placed in future assignments.

78. This threat of termination to interfere with Plaintiff's FMLA rights to medical leave was documented in a series of text messages between Plaintiff and her AYA recruiter.

79. Within approximately 3 month or in close temporal proximity with Plaintiff's protected activities of seeking FMLA leave and publishing her informational TikTok video, Plaintiff was discharged on February 19, 2025—just two days before her requested medical leave for a medical procedure.

80. As a direct result of her termination, Plaintiff was forced to cancel her necessary medical procedure and lost her health insurance coverage.

81. OPWDD/CNY DDSO were aware of Ms. Ryan's medical condition and her need for medical treatment, as she had been on protected medical leave in December 2024 and had communicated her upcoming medical procedure date.

82. Accordingly, OPWDD/CNY DDSO participated in, directed, and/or ratified the decision to terminate Plaintiff from her employment which violated Plaintiff's rights under the FMLA and further evidenced their animus toward Plaintiff for exercising her right under FMLA.

**Single Employer or Joint Employer Status**

83. NYLL §741(b) states in relevant part, "(b) "Employer" means …the state, or any political subdivision of the state which (i) provides health care services in a facility licensed pursuant to article twenty-eight or thirty-six of the public health law; …(iii) operates and provides health

18

care services under the mental hygiene law or the correction law…"

84.    At all relevant times, OPWDD and CNY DDSO were agents of the State or political subdivisions of the state that employed Plaintiff at their facilities and exercised complete control over the essential terms and conditions of Plaintiff's employment, including her daily work assignments, shift schedules, work location, patient care duties, workplace policies, and safety protocols.

85.    As alleged throughout this Complaint OPWDD and CNY DDSO shared the same employees, officers and management.

86.    At all relevant times, OPWDD and CNY DDSO possessed the authority to hire, fire and/or discipline Plaintiff and directly supervised Plaintiff's work duties.

87.    At all relevant times, OPWDD and CNYDDSO were aware of Plaintiff's protected activities, including her complaints about unsafe working conditions, her protected speech regarding labor law violations, and her medical condition requiring FMLA leave.

88.    A reasonable fact finder would find that Plaintiff's exercise of her rights to request and take FMLA leave was a motivating factor in discriminating and discharging Plaintiff.

89.    Under these circumstances, OPWDD and CNYDDSO functioned as a single employer or joint employers with AYA and are liable for the retaliatory termination of Plaintiff's employment assignment.

90.    As a direct and proximate result of Defendants' unlawful and retaliatory termination of Plaintiff's employment, Plaintiff has suffered substantial economic and compensatory damages for which she seeks including but not limited to: back pay, front pay, lost wages, lost benefits, lost health insurance coverage, emotional distress damages, damages for professional reputational harm, punitive damages, attorney's fees and costs in amounts to be determined at the time of trial.

## AS AND FOR A FIRST CAUSE OF ACTION –
### (Defendants' violation of Plaintiff's First Amend. Rights 42 U.S.C. § 1983)

91. Plaintiff repeats and re-alleges each and every previous allegation as if fully set forth herein.

92.     42 USC §1983 states in relevant part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage or any State…subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress…"

93.     The First Amendment to the U.S. Constitution states in relevant part, Congress shall make no law…abridging the freedom of speech, …or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

94.     The Fourteenth Amendment to the US Constitution states in relevant part, "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  The Fourteenth Amendment thereby makes federal law applicable to the states on the U.S. including the state of New York.

95.     As alleged throughout this Complaint, Defendants OPWDD and CNYDDSO were at all relevant times agents of the state of New York or state actors within the meaning of 42 USC §1983.

96.     As alleged throughout this Complaint, Defendants Lenhart and Jenkins were individual state actors and are subject to supervisory liability within the meaning of 42 USC §1983.

97.     As alleged throughout this Complaint, Plaintiff's TikTok videos spoke truthfully to the public about unreasonable mandatory overtime practices that placed healthcare workers and their

20

patients in danger as well as the need for New York labor law protections for healthcare workers. At all relevant times, this truthful speech was protected under the First Amendment to the US Constitution.

98.     As alleged throughout this Complaint, as a direct result of Ms. Ryan's tik tok videos, Defendants terminated her employment on or about February 19, 2025 stating that "it left a bad taste in their mouth," and on the same day as her termination, Defendants further imposed a blanket policy on all employees prohibiting videos related to or concerning the Defendants' facilities or face discipline up to and including discharge.

99.     As alleged throughout this Complaint, individual defendants Lenhart and Jenkins as supervisors of Plaintiff were in the best position to remediate violations of Plaintiff's free speech and employment rights but instead engaged in conduct to interfere with and violate those rights of the Plaintiff.

100.    Such blanket prohibition on speech violated not only employees' First Amendment Rights to protected speech but also for example, speech protected under Section 7 of the National Labor Relations Act ("NLRA").  Section 7 guarantees in relevant part, employees the right to engage in concerted activities for mutual aid or protection for the purposes of protecting employees against threats of adverse consequences if employees engage in protected activities to improve their working conditions.  The same or similar speech is also protected under the New York Labor Law.

101.    The Defendants' prohibition of Plaintiff's and other employees speech from on or about February 19, 2025 was a direct violation of not only the First Amendment but also protected employee speech under the NLRA.

102.    Defendants' termination of Plaintiff's employment on or about February 19, 2025 was furthermore a violation of the NYLL §741 as it was a retaliatory discharge for Plaintiff's engaging

21

in protected activities for complaining of violations of NYLL §167 that restricts mandatory overtime for nurses as alleged throughout this complaint.

103.  As alleged throughout this Complaint, Defendants' policies and practices caused Plaintiff to work 24 to 27 hours continuously without advance notice and which created a danger to Plaintiff and patients due to excessive fatigue.

104.  As alleged throughout this Complaint, Plaintiff also complained to Defendants and AYA about lack of medical supplies that created a danger to patients which was protected activity under NYLL §741.  In close temporal proximity of approximately 2 to 3 months later, Plaintiff was discharged.

105.  Under a strict scrutiny constitutionality analysis for view point and/or content based prohibition of speech, Defendants did not have any compelling governmental interest in restricting Plaintiff's or other employees' speech other than to unlawfully cover up their systemic failures to maintain a safe work environment for their employees and patients.

106.  Furthermore, Defendants' blanket policies and practices of prohibiting all videos or speech regardless of their content and subjecting their employees to a blanket threat of discipline and discharge underscores that Defendants failed to use the least restrictive means of protecting any compelling governmental interest. Defendants' blanket policies and practices concerning employees' free speech served only to chill protected speech as set forth throughout this Complaint.

107.  As state actors, Defendants, subjected Plaintiff, a citizen of the United States and the state of New York, to a deprivation of her rights secured under the First Amendment to the US Constitution and was injured when she was summarily discharged by Defendants.

22

108.    Individual Defendants are also subject to supervisory liability under §1983 because each of the individual Defendants engaged in or participated in the deprivation of Plaintiff's right to free speech and created or perpetuated an unconstitutional policy of "no videos" or be subject to discipline and discharge as alleged throughout this Complaint.

109.    As alleged throughout this Complaint, individual defendants also exhibit a deliberate indifference to Plaintiff's constitutional rights to chill Plaintiff's and other employees right to free speech.

110.    As a direct and proximate result of Defendants' deprivation of Plaintiff's First Amendment rights in violation of §1983, Plaintiff seeks redress and to recover backpay, front pay in lieu of reinstatement, back pay, front pay, lost wages, lost benefits, lost health insurance coverage, emotional distress damages, damages for professional reputational harm, punitive damages, attorney's fees and costs in amounts to be determined at the time of trial.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Retaliation in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.)**

111.    Plaintiff repeats and re-alleges each and every previous allegation as if fully set forth herein.

112.    The Family Medical Leave Act 29 USC §2612(a)(1) states in relevant part, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:…(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

113.    As alleged throughout this Complaint, Defendants CNYDDSO/OPWDD were public agencies or employers within the meaning of the FMLA pursuant to 29 USC §2611 (4) (B) which states in relevant part, "a public agency shall be considered to be a person engaged in commerce or in an industry or activity affecting commerce." As referenced in 29 USC 2611 (1)(A)(iii) and

23

defined in 29 USC §203 (x) "public agency means….the government of a State or political subdivision thereof;..."

114.    As alleged throughout this Complaint, Plaintiff was eligible for and was granted FMLA leave for approximately 3 weeks from on or about December 2024 when she was hospitalized and required further hospitalization for follow-up medical procedures from on or about February 21, 2025.   Accordingly, Plaintiff was entitled to further leave beyond 3 weeks that she already exhausted up to 12 weeks pursuant to §2612.

115.    FMLA §2615(a)(1) states in relevant part, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

116.    FMLA §2615(a)(2), states in relevant part, "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter."

117.    As alleged throughout this Complaint, Plaintiff engaged in protected activity under the FMLA by inquiring on or about December 04 about further FMLA leave and expressing her intent to apply for further medically necessary leave from on or about February 21, 2025.

118.    As alleged throughout this Complaint, Courts in this Circuit consider a 2 to 3 month time period to be "close temporal proximity" within the meaning of anti-retaliation statutes between an employee's protected activity and an employer's adverse employment action to constitute retaliation within the meaning of the applicable statute.

119.    As alleged throughout this Complaint in close temporal proximity to her inquiry and request for further FMLA leave on or about December 2024, Plaintiff was discharged on or about February 19, 2025 which was two days before her scheduled medical procedure.

24

120. As alleged throughout this Complaint, Plaintiff was told by management by and through AYA, her employment placement agency that if she took further FMLA leave she would be discharged and blacklisted from further assignments with Defendants.

121. As alleged throughout this Complaint, a reasonable fact finder would find that Plaintiff's exercise of her rights to inquire, request and/or take FMLA leave was a motivating factor for discharging Plaintiff.

122. Accordingly, Defendants as joint employers interfered with, restrained and/or otherwise denied Plaintiff's exercise of or attempt to exercise her right to further leave starting on or about February 21, 2025 in violation of the FMLA.

123. As a direct and proximate result of Defendants' retaliation in violation of the FMLA, Plaintiff seeks redress and to recover backpay, front pay in lieu of reinstatement, back pay, front pay, lost wages, lost benefits, lost health insurance coverage, emotional distress damages, damages for professional reputational harm, liquidated damages, punitive damages, attorney's fees and costs in amounts to be determined at the time of trial.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Retaliation in Violation of New York Labor Law § 741)**

124. Plaintiff repeats and re-alleges each and every previous allegation as if fully set forth herein.

125. New York Labor Law ("NYLL") §741 states in relevant part, "(g) "Retaliatory action" means the discharge, suspension, demotion, penalization or discrimination against an employee, or other adverse employment action taken against an employee in the terms and conditions of employment."

126. NYLL §741(2) states in relevant part, "no employer shall take retaliatory action against

any employee because the employee does any of the following: (a) discloses…to a social media forum available to the public at large, an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety; or (b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care or improper quality of workplace safety."

127.    As alleged throughout this Complaint, Plaintiff made good faith complaints to management at AYA and Defendants about lack of adequate medical supplies at Defendants' facilities and mandatory overtime scheduling posed a danger to the safety of workers and patients.

128.    As alleged throughout this Complaint, Defendants violated NYLL §167 when they imposed mandatory overtime in excess of 24 hours in consecutive work shifts without an emergency and regularly imposed such unreasonable work shifts without reporting such need to the NYS department of labor and/or department of labor as required under NYLL §167.

129.    After Defendants had ample opportunities but failed to correct the complained of work and facilities conditions, Plaintiff posted a tik tok video, which is a social media forum available to the public at large, to bring awareness to the public of Defendants' improper quality of patient care and posing a public health risk to employees and patients alike.

130.    As alleged throughout this Complaint Plaintiff engaged in protected activity under §741 by objecting to and opposing unsafe working conditions at Defendants' facilities and in close temporal proximity was discharged which constituted retaliation in violation of §741.

131.    As a direct and proximate result of Defendants' retaliation in violation of NYLL §741, Plaintiff seeks redress and to recover backpay, front pay in lieu of reinstatement, back pay, front pay, lost wages, lost benefits, lost health insurance coverage, emotional distress damages, damages

for professional reputational harm, punitive damages, attorney's fees and costs in amounts to be determined at the time of trial.

## JURY DEMAND

132.     Plaintiff demands trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**,   Plaintiff Jennifer Ryan respectfully requests that this Court enter judgment in her favor and against Defendants jointly and severally as follows:

A. Declaring that all named Defendants deprived Plaintiff of her First Amendment rights to free speech that caused her to be discharged in violation of 42 USC §1983 in the First Cause of Action; and

B. Declaring that Defendants NYSOPDD and CNYDDSO interfered with and denied Plaintiff her rights to medical leave under the FMLA 29 USC §2612 et seq. and retaliated against Plaintiff with summary discharge for exercising her rights under the FMLA in the Second Cause of Action; and

C. Declaring that all named Defendants retaliated against Plaintiff with summary discharge in violation of NYLL §741 in the Third Cause of Action because Plaintiff complained and opposed what Plaintiff believed in good faith to be Defendants NYSOPDD and CNYDDSO's unlawful polices and practices of maintaining inadequate medical supplies and subjecting LPNs including Plaintiff to unnecessarily long work shifts in excess of 24 consecutive hours without an emergency in violation of NYLL §167  that posed a danger to public health and/or safety; and

D. Awarding Plaintiff back pay, front pay, and other compensatory damages for economic losses, including lost wages, lost benefits, lost health insurance, and other financial harm, in an amount to be determined at trial; and

E. Award liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii); and

F. Awarding Plaintiff compensatory damages for non-economic harm, including emotional distress, mental anguish, reputational injury, humiliation, and pain and suffering, in an amount to be determined at trial; and

G. Awarding Plaintiff applicable punitive damages; and

H. Awarding Plaintiff reasonable attorneys' fees and costs incurred in prosecuting this action as permitted under the applicable law or statute; and

I. Awarding Plaintiff pre-judgment and post-judgment interest; and

J. Granting such other and further relief as this Court deems just and proper.

Dated: April 28, 2026

NISAR LAW GROUP, P.C.

/s/ Susan Ghim

By: _____

Susan Ghim, Sr. Litigation Counsel
Attorneys for Claimant
60 East 42nd Street, Suite 4600
New York, New York 10165
Tel.: (212) 600-9534
Email: sghim@nisarlaw.com